U.S. DISTRICT COURT
**N.D. OF N.Y.**
**FILED**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

APR 0 2 2015

LAWRENCE K. BAERMAN, CLERK

ALBANY

UNITED STATES OF AMERICA and
STATE OF NEW YORK ex rel. JOHN DOE,

               Plaintiffs,

        -against-

HEALTH QUEST SYSTEMS, INC. and HEALTH
QUEST MEDICAL PRACTICE, P.C.

               Defendants.

1: 15 CV 396 TJM/DEP

Filed under seal pursuant to
31 U.S.C. § 3730(b)(2)

## COMPLAINT AND DEMAND FOR JURY TRIAL

1.     This is a civil action by Relator John Doe (whose true identity has been separately

disclosed to the United States Attorney's Office for the Northern District of New York and the

Office of the Attorney General for the State of New York) ("Relator") on his own behalf and on

behalf of the United States of America and the State of New York against defendants Health Quest

Systems, Inc. ("HQSI") and Health Quest Medical Practice, P.C. ("HQMP") (collectively,

"Defendants") under the *qui tam* and anti-retaliation provisions of the False Claims Act, 31 U.S.C.

§ 3729 *et seq*. ("FCA") and the New York State False Claims Act, N.Y. State Finance Law §§ 187

*et seq*. ("NYSFCA"), for treble damages, per claim/per false statement penalties, attorneys' fees and

litigation expenses and other relief arising from Defendants' fraudulent billing wrongful retention

practices against the Medicare program and the Medicaid program in New York, as well as two

times lost compensation, attorneys' fees and litigation expenses and other relief because of

Defendants' wrongful retaliation against Relator for engaging in lawful whistleblowing activities

under the FCA and NYSFCA.

1

## NATURE AND OVERVIEW OF THE ACTION

2.      As set forth more fully below in this complaint, Defendants violated the FCA and the NYSFCA by: (a) billing Medicare and Medicaid for higher levels of office visit services than were actually provided ("upcoding"); (b) billing Medicare for Annual Wellness Visits ("AWVs") that were not fully performed in the required manner; (c) billing Medicare and Medicaid for *locum tenens* physician services that were performed for ineligible physicians; (d) billing Medicare and Medicaid for physician assistant ('PA") services where the supervising physician was overseeing an excessive number of PAs; (e) billing Medicare and Medicaid for nurse practitioner ("NP") and PA services as "incident to" a physician's services when the physician did not directly supervise the NPs or PAs; (f) falsifying the status of unsigned medical records; (g) engaging in referral and employment compensation business practices that violated the Anti-Kickback Statute ("AKS") and the Stark Law; and (h) retaining overpayments that were received through the foregoing unlawful billing practices.

3.      Relator was fired by Defendants after he investigated and then reported and objected to these unlawful billing practices in conversations, meetings or emails with Defendants' other senior level executives and managers, including HQMP's President/CEO and Chief Operating Officer ("COO"). Following his termination, Defendants also wrongfully withheld employment compensation benefits to which Relator was entitled.

4.      As a result of the above-described activities, the United States, the State of New York and Relator have suffered economic losses, the precise amount of which will be determined at trial.

2

## JURISDICTION

5.      The Court has subject matter jurisdiction over the federal claims alleged in this complaint under 31 U.S.C. § 3732(a) (False Claims Act), 28 U.S.C. § 1331 (federal question), and § 1345 (United States as plaintiff).  Jurisdiction over the state law claims arises under 31 U.S.C. § 3732(b) (jurisdiction over state claims arising from the same transaction or occurrence as an action under the federal FCA), and 28 U.S.C. § 1367(a) (supplemental jurisdiction).

6.      The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a) because Defendants can be found, reside, and transact business in the Northern District of New York and because an act proscribed by 31 U.S.C. § 3729 occurred within this District. Section 3732(a) further provides for nationwide service of process.

## VENUE

7.      Venue is proper in the Northern District of New York under 28 U.S.C. §§ 1391(b) and (c), and 31 U.S.C. § 3732(a) in that Defendants reside and transact business, and a substantial part of the events or omissions giving rise to the violations of 31 U.S.C. § 3729 alleged in this complaint occurred, in this District.

## PARTIES, ENTITIES, AND INDIVIDUALS

8.      The United States, through the United States Department of Health and Human Services ("HHS"), and the State of New York, through the New York State Department of Health ("NYSDOH"), are the real parties in interest in the *qui tam* claims in this action.

9.      HHS is located at 200 Independence Avenue, SW, Washington, DC 20201. Within HHS, the Centers for Medicare and Medicaid Services ("CMS") administers and funds the Medicare program and co-funds the Medicaid program.  CMS is located at 7500 Security Boulevard, Baltimore, Maryland, 21244-1850.

3

10.     Upon information and belief, including based upon its website, at all relevant times, National Government Services, Inc., ("NGS") was a private Medicare administrative contractor ("MAC") that, on behalf of HHS and CMS, processed Medicare Part A and Part B claims submitted by healthcare providers in New York State, including Defendants.  NGS is owned by WellPoint.  NGS' corporate office is located at 8115 Knue Road, Bldg. 48, Indianapolis, IN 46250.

11.     The State of New York co-funds the New York Medicaid program and is responsible for administering it.

12.     Acting on behalf of the State of New York, NYSDOH administers the Medicaid program through its Office of Health Insurance Programs, which is located at Corning Tower, Empire State Plaza, Albany, NY 12237.  New York Medicaid claims are processed through the New York State Medicaid Management Information System ("MMIS"), currently also referred to as "eMedNY."

13.     Upon information and belief, including based upon its website, at all relevant times, Computer Sciences Corporation ("CSC") was a private internet technology contractor that, on behalf of NYSDOH, processed New York Medicaid claims submitted to MMIS/eMedNY by healthcare providers in New York State, including Defendants.  CSC processes New York Medicaid claims at offices located at 327 Columbia Turnpike Rensselaer, New York 12144.

14.     Relator is a resident of Connecticut.  At times relevant to this action, Relator was employed by HQSI in an upper management-level position as the Director of Operations.  Relator began working at HQSI in or about March 2012 and was fired without warning or notice in or about October 2012.

15.     HQSI describes itself on its website as the "Mid-Hudson Valley's largest integrated healthcare system."  According to public records, HQSI is a New York not-for-profit corporation

4

with headquarters located at 1351 Route 55, Suite 200, LaGrangeville, New York 12540-5144. It was formed through an affiliation of Northern Dutchess Hospital in Rhinebeck, New York, Putnam Hospital Center in Carmel, New York and Vassar Brothers Medical Center in Poughkeepsie, New York. HQSI's stated mission in its IRS Form 990 is to provide support to member organizations of the Health Quest system. These member organizations include HQMP; Health Quest ACO, LLC; Health Quest Urgent Medical Care Practice, P.C.; and other medical practice groups. HQSI's support includes performing billing services, including billing Medicare and Medicaid for reimbursements for healthcare services.

16.     HQMP describes itself on its website as a "multi-specialty medical group focused on delivering quality health care to the residents of the Hudson Valley." According to public records, HQMP is a New York not-for-profit corporation with headquarters at the same address as HQSI. HQMP employs approximately 200 healthcare providers. HQMP's annual billings are approximately $80 million, of which approximately thirty-five percent (35 %) is derived from Medicare and Medicaid patients. HQMP bills Medicare on a fee-for service basis; it does not have capitated contracts with Medicare.

## FALSE CLAIMS LIABILITY UNDER THE FCA AND NYSFCA

### FCA

17.     The FCA as amended on May 20, 2009, imposes civil liability on "any person" who, among other things:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;...or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. §§ 3729(a)(1)(A), (B) and (G) [amended May 20, 2009].

### FCA DAMAGES, PENALTIES AND AWARDS FOR FALSE CLAIMS

18.    The FCA imposes liability on any person violating Section 3729 to the United States Government as follows: a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104–410), plus three (3) times the amount of damages which the Government sustained because of the act of that person.  31 U.S.C. § 3729(a)(1).

19.    Where the Government proceeds with an action commenced by the filing of a *qui tam* complaint and recovers money from a defendant under Section 3729, the person who initiated the action (the "relator") may receive up to twenty-five percent (25%) of the proceeds.  Where the Government does not proceed with such an action and the relator pursues it on his/her own and recovers proceeds from a defendant under Section 3729, the relator may receive up to thirty percent (30 %) of the proceeds.  In either case, the relator is also entitled to an award against the defendant for the amount of all reasonable expenses, attorneys' fees and costs.  31 U.S.C. § 3730(d).

### NYSFCA LIABILITY FOR FALSE CLAIMS

20.    The NYSFCA, effective as of August 27, 2010, imposes civil liability on "any person" who, among other things:

(a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement

6

material to a false or fraudulent claim;

(g) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government; or

(h) Knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a local government, or conspires to do the same.

N.Y. State Fin. Law §§189(1)(a), (b), (g) and (h) [August 27, 2010].

## NYSFCA DAMAGES, PENALTIES AND AWARDS FOR FALSE CLAIMS

21.     The NYSFCA imposes liability on any person violating Section 189(1) to the state or a local government, as applicable, for a civil penalty of not less than $6,000 and not more than $12,000, plus three (3) times the amount of all damages, including consequential damages, which the state or local government sustains because of the act of that person.  N.Y. State Fin. Law §189(1).

22.     Where the State or local government proceeds with an action commenced by the filing of a *qui tam* complaint and recovers money from a defendant under Section 189(1), the relator may receive up to twenty-five percent (25%) of the proceeds.  Where the State or local government does not proceed with such an action and the relator pursues it on his/her own and recovers proceeds from a defendant under 189(1), the relator may receive up to thirty percent (30 %) of the proceeds.  In either case, a relator who prevails in a NYSFCA *qui tam* action is also entitled to receive from the defendant the amount of all reasonable expenses, attorneys' fees and costs.  N.Y. State Fin. Law §190(6).

7

## RELEVANT FCA AND NYSFCA DEFINITIONS

23.    For purposes of the FCA, "claim" means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that  (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or  (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.  31 U.S.C. § 3729(b)(2)(A) (as amended May 20, 2009; the prior version is materially identical for purposes of this action).

24.    For purposes of the NYSFCA,  "claim" means any request or demand, whether under a contract or otherwise, for money or property that (i) is presented to an officer, employee, or agent of the state or a local government; or  (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the state or a local government's behalf or to advance a state or local government program or interest, and if the state or local government (A) provides or has provided any portion of the money or property requested or demanded; or (B) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.  N.Y. State Fin. Law § 188(1)(a).

25.    For purposes of the FCA and the NYSFCA, "knowing" and "knowingly" mean that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.31 U.S.C. § 3729(b); N.Y. State Fin. Law § 188(3)(a).

8

26.     For purposes of the FCA and the NYSFCA, "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.  31 U.S.C. § 3729(b)(3); N.Y. State Fin. Law § 188(4).

27.     For purposes of the FCA and the NYSFCA, "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4); N.Y. State Fin. Law § 188(5).

### *QUI TAM*-RELATED BARS

28.     Upon information and belief, none of the bars set forth in either the FCA's or NYSFCA's *qui tam*-related provisions, 31 U.S.C. §§ 3730(b)(5) and (e) and N.Y. State Fin. Law §§ 190(4) and (9), respectively, is applicable to this action.

29.     Upon information and belief, prior to any "public disclosure" (as defined by the FCA and NYSFCA), and prior to the filing of this action, on and before, November 18, 2014, Relator voluntarily disclosed to the United States Attorney's Office for the Northern District of New York, the information on which the allegations or transactions in this complaint are based.

30.     Through his employment by Defendants, Relator is an "original source" of the information on which his allegations are based, within the meaning of the FCA and NYSFCA.

### RETALIATION LIABILITY UNDER THE FCA AND NYSFCA

### FCA LIABILITY FOR RETALIATION

31.     Section 3730(h) of the FCA provides:

(1) Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in

9

furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

(2) Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

31 U.S.C. § 3730(h).

## NYSFCA LIABILITY FOR RETALIATION

32.    The NYSFCA provides that:

Any current or former employee, contractor, or agent of any private or public employer who is discharged, demoted, suspended, threatened, harassed or in any other manner discriminated against in the terms and conditions of employment, or otherwise harmed or penalized by an employer, or a prospective employer, because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action brought under this article or other efforts to stop one or more violations of this article, shall be entitled to all relief necessary to make the employee, contractor or agent whole. Such relief shall include but not be limited to:

(a) an injunction to restrain continued discrimination;

(b) hiring, contracting or reinstatement to the position such person would have had but for the discrimination or to an equivalent position;

(c) reinstatement of full fringe benefits and seniority rights;

(d) payment of two times back pay, plus interest; and

(e) compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

N.Y. State Fin. Law § 191(1).

33.    For purposes of Section 191(1), a "lawful act" shall include, but not be limited to:

obtaining or transmitting to the state, a local government, a qui tam plaintiff, or private counsel solely employed to investigate, potentially file, or file a cause of action under this article, documents, data, correspondence, electronic mail, or any other information, even though such act may violate

10

a contract, employment term, or duty owed to the employer or contractor, so long as the possession and transmission of such documents are for the sole purpose of furthering efforts to stop one or more violations of this article.

N.Y. State Fin. Law § 191(2).

## PATIENT PROTECTION AND AFFORDABLE CARE ACT

34.     The Patient Protection and Affordable Care Act of 2010 ("PPACA"), P.L. 111-148, 124 Stat. 119 (March 23, 2010) makes the failure to reimburse Medicare or Medicaid within 60 days for an overpayment a so-called "reverse false claims violation" under the FCA and NYSFCA, see 31 U.S.C. § 3729(a)(1)(G) and N.Y. State Fin. Law §§189(1)(g) and (h).

35.     Section 6402(a) of the PPACA (Enhanced Medicare and Medicaid Program Integrity Provisions), Pub. L. No. 111-148, 124 Stat. 119, 753-56 (2010), defines what constitutes an overpayment under the FCA and NYSFAC in the context of federal healthcare programs. Under this section, overpayments are "any funds that a person receives or retains under Title XVIII [Medicare] or XIX [Medicaid] to which the person, after applicable reconciliation, is not entitled." 42 U.S.C. § 1320a–7k(d)(4)(B).

36.     Under 42 U.S.C. § 1320a-7k(d), the failure to timely return an overpayment is an "obligation" to the federal and New York State governments within the meaning of § 3729(b)(3) of the FCA and § 188(4) of the NYSFCA, respectively.   Recipients of an overpayment from Medicare and Medicaid must report it to the government insurers and must return the overpayment within 60 days from when it was first identified (or reasonably should have been identified), or the date any corresponding cost report is due, whichever is later.

11

## MEDICARE AND MEDICAID PROGAMS

37.     Medicare, enacted in 1965 under Title XVIII of the Social Security Act, is a third party reimbursement program that underwrites medical expenses of the elderly and the disabled. 42 U.S.C.§§ 1395 et seq.  Medicare reimbursements are paid from the federal Supplementary Medical Insurance Trust Fund.  Medicare Part A covers hospital services.  Medicare Part B generally covers physician services, including medical and surgical treatment and outpatient treatment and diagnosis.  Part B, 42 U.S.C. §§ 1395j et seq.; 1395l (payment of benefits). The FCA Medicare *qui tam* claims at issue in this action arise under Medicare Part B.

38.     Medicaid, enacted in 1965 under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq., is a medical assistance program for indigent and other needy people that is financed by joint federal and state funding and is administered by the states according to federal regulations, oversight, and enforcement.  Each state implements its version of Medicaid according to a State Plan that has been approved by HHS.  Within broad federal regulatory and policy guidelines (see 42 C.F.R. § 430 et seq., and CMS publications), the states determine who is Medicaid-eligible, what services are covered, and how much to reimburse healthcare providers. The states, through intermediaries, also receive healthcare provider claims for program reimbursements, evaluate those claims, make payments to the healthcare providers, and present the claims to HHS/CMS for reimbursement of the federal government's share.

39.     New York's Medicaid Program was established in 1966. Act of Apr. 30, 1966, ch. 256, 1966 N.Y. Laws 844.  By statute, NYSDOH administers this program at the state level.  N.Y. Pub. Health Law § 201(1)(v).  The FCA and NYSFCA Medicaid *qui tam* claims at issue in this action arise under the New York Medicaid program.

12

## BILLING PROCEDURES AND CLAIMS FOR
## MEDICARE AND MEDICAID PAYMENTS

40.     The bills Defendants electronically submitted to Medicare and Medicaid are the "claims" at issue for purposes of the FCA and NYSFCA.

41.     Medicare and Medicaid pay for covered services and supplies only when they are reasonable and medically necessary.

42.     Providers, such as HQMP and HQSI, submit claims to Medicare by billing a private carrier, known as a Medicare Administrative Contractor or MAC, which process the claims on behalf of HHS.  National Government Services, Inc. is currently the MAC for Part A and Part B claims for covered services in the State of New York (as well as certain neighboring areas).

43.     Providers who submit claims electronically to CMS or to CMS contractors, including A/B MACs, must certify in their application that, among other things, they "will submit claims that are accurate, complete, and truthful," and must acknowledge that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law."  See Medicare Claims Processing Manual, § 30.2.A.

44.     Medicaid claims are processed in the eMedNY system, operated by Computer Sciences Corporation at a facility in Rensselaer, New York under contract with NYDOH.

45.     Providers who submit claims to the New York State Medicaid program must certify, among other things, that all statements in the claim made are true, accurate and complete to the best of the provider's knowledge; that no material fact has been omitted; that the provider is

13

bound by all rules, regulations, policies, standards, fee codes and procedures of the NYDOH as set forth in Title 18 of the Official Compilation of Codes, Rules and Regulations of New York State and other publications of the Department, including Provider Manuals and other official bulletins of the Department; and that the certifications are true. See New York State Medicaid Program: Information For All Providers—General Billing (current version at https://www. emedny.org/ProviderManuals/AllProviders/PDFS/archive/Information_for_All_Providers-General_Billing-2004-01.pdf).

46.     18 N.Y.C.R.R § 504.3 states that by enrolling in the Medicaid program, a provider agrees among other things to prepare and maintain contemporaneous records demonstrating its right to reimbursement; maintain records of services furnished and claims for payment for a period of six years; and submit claims for payment only for services that are actually rendered, medically necessary or otherwise authorized by the Social Services Law, and are furnished to eligible individuals. Providers further agree that information provided in relation to claims for payment is true and that the provider complies with the rules, regulations and official directives of the department.

47.     As a condition of payment by the New York State Medicaid program, every participant and beneficiary in the Medicaid Program is subject to 18 NYCRR § 515.5, which makes compliance with all conditions of participation in the program a condition of payment for any good or service furnished under the program. That provision provides, in pertinent part: "(a) No payments will be made to or on behalf of any person for the medical care, services or supplies furnished . . . in violation of any condition of participation in the program . . . . (b) No payment will be made . . . for any medical care, services or supplies ordered or prescribed in violation of any condition of participation in the program." 18 NYCRR 515.5 (emphasis added).

14

## APPLICABLE BILLING LAWS, REGULATIONS, AND POLICIES

### A.    Upcoding Billing

48.    An upcoded healthcare reimbursement claim is one where a healthcare provider seeks an overpayment from an insurer by submitting a bill for a more expensive, complicated or involved healthcare service than was actually needed or provided. As such, an upcoded claim is false and fraudulent under Medicare and Medicaid.

### B.    Annual Wellness Visits Billing

49.    In 2011, as part of the PPACA, Medicare began covering AWVs. 42 U.S.C. 1395x(hhh); 42 C.F.R. § 405.2449(c). The purpose of an AWV is to provide the beneficiary with a personalized prevention plan, which can adapt as the beneficiary's health needs change over time.

50.    To lawfully bill Medicare for an AWV, the provider must perform a mandatory minimum set of services. There are approximately 12 components to the Annual Wellness Visit. These include: a medical and family history; current medical providers; height, weight, body mass index ("BMI"), blood pressure ("BP") and other appropriate routine measurements; detection of cognitive impairment; review risk factors; review of functional ability; establishing a written screening schedule for 5-10 years; establishing a list of risk factors; and providing advice and referrals to health education and preventative counseling services. These services are mandated by section 4103 of the PPACA, 42 U.S.C. § 1395x(hhh). The elements of each of these components are specified in detail in Medicare regulations, 42 C.F.R. § 410.15.

51.    Patients are eligible to receive an AWV if more than 12 months have passed since the effective date of their first Medicare Part B coverage period and if they have not received either an initial preventive physical examination ("IPPE") or an AWV within the prior 12 months. See

15

42 CFR 411.15(a)(1) and 411.15 (k)(15) of 42 CFR (list of examples of routine physical examinations excluded from coverage). There is no cost to the beneficiary for an AWV; all Medicare Part B coinsurance charges and deductibles are waived.

52.     In contrast to AWVs, Medicare continues to exclude from coverage routine physical checkups, i.e., examinations performed for a purpose other than treatment or diagnosis of a specific condition (except mammography, colorectal cancer, and a few other specified screening examinations). 42 C.F.R. § 411.15. Medicare notice to providers about AWVs states, "For dates of service on or after January 1, 2011, Medicare covers an AWV providing Personalized Prevention Plan Services ("PPPS") at no cost to the beneficiary, so beneficiaries can work with you to develop and update a personalized prevention plan. This benefit provides an ongoing benefit that focuses on prevention that adapts as a beneficiary's health needs change over time . . . . NOTE: The AWV is a preventive wellness visit and is not a routine physical checkup that some seniors may get every year or two from their physician or other qualified non-physician practitioner. *Medicare does not provide coverage for routine physical examinations.*" HHS-CMS Medicare Learning Network, Official CMS Information for Medicare Fee-for-Service Providers, "Providing the Annual Wellness Visit (AWV)," pp. 2-3 (emphasis by CMS). See Medicare Benefit Policy Manual, § 280.5, "Annual Wellness Visit"; Medicare Claims Processing Manual, §§ 140 et seq., "Annual Wellness Visit."

### C.     *Locum Tenens* Billing

53.     A locum tenens physician is one who temporarily fills in for a patient's regular physician. Under Medicare rules and policies, the regular physician may bill for the services of a *locum tenens* physician if certain specified conditions are met. Among other things, a medical practice cannot bill for a *locum tenens* physician's services under the name of a regular physician

16

if the regular physician left the practice and the *locum tenens* services were provided more than 60 days after the regular physician's departure. See Social Security Act § 125(b); Medicare Claims Processing Manual, ch. 1, § 30.2.11.

### D.   Supervised Physician Assistant Billing

54.   Under New York law, 10 N.Y.C.R.R. § 94.2(c) and (d), a physician may supervise no more than two PAs at one time in a private practice setting, and no more than six PAs at one time in a hospital setting.

### E.   Incident To Billing

55.   Medical aides, such as NPs and PAs, may bill for their services under a physician's billing provider number when the aide's services are "incident to" services rendered by the physician. Among other billing requirements, the aide's incident to services must be furnished under the physician's "direct supervision." Direct supervision in the office setting does not mean that the physician must be present in the same room with the aide. However, a physician must at least be present in the office suite and immediately available to provide assistance and direction to the aide throughout the time he or she is performing the "incident to" services. Medicare Benefit Policy Manual, ch. 15, §§ 60, 60.1, 60.2.

### F.   Dating and Signing Medical Records

56.   A medical record that is backdated or that is signed in a physician's name by someone else is fraudulent in that it misrepresents when or by whom it was signed. In addition, such practices violate various regulations Medicare regulations, e.g., 42 C.F.R. § 424.33 (all claims for services of providers and all claims by suppliers and nonparticipating hospitals must be signed by the provider, supplier, or hospital unless CMS instructions waive this requirement); 42 C.F.R. § 412.46 (payment to hospitals under the prospective payment system is based in part on each

patient's principal and secondary diagnoses and major procedures performed, as evidenced by the physician's entries in the patient's medical record).

### G.   Anti-kickback Statute and Stark Law

57.     The AKS generally prohibits offering or paying remuneration in return for referring an individual for the furnishing of services for which payment may be made under a Federal health care program. 42 U.S.C. § 1320a-7b(b)(2)(A).

58.     The Stark Law prohibits a physician from making referrals for certain designated health services ("DHS"), including hospital inpatient and outpatient services, payable by Medicare to an entity with which he or she (or an immediate family member) has a financial relationship (ownership, investment, or compensation), unless an exception applies; and prohibits the entity from presenting or causing to be presented claims to Medicare (or billing another individual, entity, or third party payer) for those referred services. 42 U.S.C. § 1395nn. Under 42 U.S.C. § 1396b, the self-referral prohibition extends to the Medicaid program as well.

59.     Claims that include items or services resulting from a violation of the AKS or of the Stark Law constitute false or fraudulent claims under the FCA. 42 U.S.C. § 1320a-7b(g), as amended by section 6402(f)(1) and (2) of PPACA. The amendment further provides that violations do not require actual knowledge of the statute or specific intent to violate it. 42 U.S.C. § 1320a-7b (h).

### H.   Wrongful Retention

60.     Under the PPACA, the failure to reimburse Medicare or Medicaid for an overpayment within 60 days of the date when one knew, or should have known, of its improper receipt is a per se violation of the FCA. 42 U.S.C. § 1320a-7k(d); 31 U.S.C. § 3729(b)(3).

## FACTUAL ALLEGATIONS CONCERNING
## DEFENDANTS' FRAUDULENT BILLING PRACTICES

**A.** **Upcoding**

61.    HQMP routinely billed Medicare and Medicaid for upcoded office visits.

62.    A May 2012 HQMP internal audit of office visit coding found the following providers to be substantial outliers for CPT codes 99201-99205 (new patient) and 99211-99215 (established patient): Ann Johnson, NP, Dr. Jose Baez, Dr. Ekaterina Milchtein, Dr. Saeeda Mahmud, Dr. Lauren Herchak, and Jill Passano, NP.

63.    Office visit services that should have been billed at a given level within the CPT 992- series were improperly upcoded to the next highest level. As examples, services which should have been coded 99201 or 99211 were coded and billed as 99202 and 99212, respectively. Additionally, office visits that should properly have been billed at an evaluation and management ("E&M") level of -01 were improperly upcoded to the next highest level.

64.    HQMP COO Cindy Jacobs was aware of and discussed the above-referenced audit with Relator in about May 2012, including its finding of upcoded billings. Jacobs told Relator that he should "not worry about it." To Relator's knowledge no action was taken to correct the upcoded claims or educate providers to prevent future occurrences.

**B.** **Billing Medicare for Annual Wellness Visits**

65.    Beginning in 2011, HQMP routinely billed Medicare for AWVs when the rendering care provider had not performed all of the approximately 12 required components of this service.

66.    HQSI Coder Patricia Hubbard reported this to Relator based on physician notes she reviewed for a coding audit. The physician notes showed that the physicians were effectively performing routine physical examinations but using AWV billing codes. Hubbard's audit revealed

19

that the physicians had not documented the minimum required services which make up an AWV. For example, Hubbard saw there often was no documentation of the required Health Risk Assessment ("HRAs") and Depression Risk Assessment.

67.     David Cho, MD, was one the physicians that Hubbard's internal audit report identified as billing AWVs when not all of the component services were provided.

68.     Relator reported Hubbard's findings to HQMP President and CEO, Dr. Arun Agarwal, and HQMP COO Cindy Jacobs on a number of occasions beginning in April 2012.

69.     In response, Agarwal and Jacobs discussed establishing an AWV template or checklist so that physicians would know what component services they had to provide in order to lawfully bill for AWVs. However, Relator observed that Defendants' senior management did not take any meaningful steps to actually implement the template solution to HQMP's improper AWV billing practices.

C.     Improper *Locum Tenens* Billing

70.     HQMP regularly hired new physicians who saw patients before they were fully credentialed. HQMP billed for these physicians' services as "locum tenens" physicians using Medicare provider numbers of former HQMP physicians who had left the group for over 60 days; or when physicians billed as "locum tenens" were not in fact temporary physicians but had signed full time employment contracts with HQMP.

71.     Relator raised this issue with HQMP COO Cindy Jacobs when the onboarding specialist and recruiter wanted a Dr. Farber to start work before he was fully credentialed with the payers. Relator told Jacobs and the onboarding specialist that Dr. Farber would need to be fully credentialed before he started, and Jacobs and the onboarding specialist insisted that "we need to see what we could do to get him to start early." Jacobs told Relator that HQMP in the past billed

for services under physicians who were no longer with the practice and that Dr. Farber could be billed as *locum tenens* under Dr. Ugras, who was scheduled to leave two weeks before Dr. Farber wanted to start (to take advantage of the 60-day window).

72.     Relator emailed Jacobs, HQSI Director of Billing, Christina Pena and others that the *locum tenens* regulations state that a *locum tenens* physician is a temporary physician and Dr. Farber did not meet the criteria since he had a signed employment agreement with HQMP. Because Dr. Farber was an employee, he was not eligible to work on a *locum tenens* basis for any period of time. Jacobs told Relator that they had done this before and would continue to do so.

73.     Relator raised the issue of improper *locum tenens* billing a number of other times, including at the meeting on September 24, 2012, where Defendants' senior management agreed that they should not bill *locum tenens* for new physicians any longer.

74.     As specific examples of improper *locum tenens* billing: Lee Farber, MD, billed under the name and provider number of Steven Ugras, MD (from approximately July 2012 to October 2012). Vikas Jindal, MD, billed most likely under the name and provider number of either Joseph Christiana, MD or Ali Hammoud, MD (from approximately July 2012 to October 2012).

75.     Upon information and belief, Victor Stelmack, MD, billed under the name and provider number of Brian Binetti, MD.

**D.      Failing to Provide Required Supervision for Surgical Physician Assistants**

76.     HQMP had one supervising physician (upon information and belief, namely, Dr. Wing) at HQSI's general surgery practice in Rhinebeck, and he oversaw between 17 and 21 surgical PAs. Frequently, this supervising physician was not even present with the PAs during surgeries they performed and for which HQMP billed Medicare and Medicaid.

21

77.     Relator reported the supervision of excessive numbers of PAs in the general surgery practice to HQMP COO Cindy Jacobs in April 2012.  Jacobs responded by saying that HQMP would hire other surgeons and pay them stipends to supervise the surgical PAs.  Jacobs further stated that she would discuss the matter with her boss, HQMP President and CEO, Dr. Arun Agarwal.  However, during Relator's tenure no remedial steps were taken to address this issue after he discussed it with Jacobs.

### E.     Improper Incident To Billing

78.     HQMP billed Medicare and Medicaid for "incident to" services provided by NPs and PAs under the provider number of surgeons who were not even on site when the services were provided.

79.     For example, HQMP billed Medicare and Medicaid for "incident to" services provided by NPs and PAs at Health Quest's Breast Center when the surgeons who were supposed to be directly supervising these services were actually performing surgeries in operating rooms at HQSI's Vassar Brothers Medical Center at the time.  Vassar Brothers' operating rooms are located in a separate building and at some distance from the Breast Center, even though they are on the same campus.

80.     This included "incident to" services provided by Paula Portelli, NP and Alexa Morgese, PA that were billed under provider billing numbers for surgeons Angela Keleher, MD and Gregory Zanieski, MD.  It also included "incident to" services for Dean Bloch, MD, who simultaneously oversaw several NPs or PAs at two different locations (Kingston and Rhinebeck) and therefore he could not, and did not, provide them with direct oversight.

81.     Relator told HQMP COO Cindy Jacobs that HQMP was billing for services provided by NPs and PAs under the names of surgeons who were not present at the Breast Center

when the services were performed, but were in the operating rooms at the Vassar Brothers Medical Center. Relator told Jacobs this was "fraudulent billing" because the physicians were not directly supervising the NPs' and PAs' services. Jacobs replied that she would look into it. However, to Relator's knowledge nothing was ever done to address this issue.

82.     In an August 23, 2012 meeting among Relator, Jacobs, and HQSI Manager of Coding and Revenue Cycle Operations, Patricia Hubbard, Jacobs was advised that Revenue Integrity Director, Lance Smith, had conducted an internal audit that revealed that Dr. Heffernan was signing all of the patient care notes of Ann Johnson, NP, and billing for her services as though he were the rendering physician (as opposed to supervising physician), when in fact he was not. Jacobs said that Smith should be doing a differently focused audit and she would speak to his superior, Tim Cleary, the Vice President of Compliance, about it.   Jacobs brushed aside the fraudulent billing issue and ended the conversation.

**F.     Backdating and retroactively signing unsigned medical records**

83.     In or about May 2012, Defendants learned that HQMP had billed Medicare (and other carriers) for thousands of services going back several years for which the corresponding electronic medical records had never been signed by the service providers, as required by Medicare rules.

84.     This issue was addressed at an HQMP Health Information Management ("HIM") committee meeting in mid-2012 that was attended by HQMP President and CEO Dr. Arun Agarwal, HQMP COO Cindy Jacobs, Relator, ECG Management Consultants (Deb McGrath and Liz McNamara), various HQMP managers, several HQMP physicians, HQMP CIO, Bob Diamond, and HQMP Director of Clinical Systems, Rosemary Ventura.

23

85.     During the above-referenced meeting, the attendees discussed having the providers go back and sign their records.  However, the consensus was not to do this because the attendees concluded it would take too much time to sign the large volume of records, and the providers would not be willing to do so anyway.

86.     Instead, the solution Defendants adopted, and HQMP CCO Cindy Jacobs implemented, was to "administratively sign off" or "close" the electronic records en masse, that is, they were electronically stamped as if the providers had signed a paper record, when in fact the providers had never reviewed or signed any of the medical records.

G.     **Anti-Kickback Statute and Stark violations**

87.     During at least 2012, HQMP paid surgeons higher than market value compensation and gave them salary increases that were not justified by their productivity.

88.     As examples, in August 2012, cardiothoracic surgeons Drs. Peter Zakow, Arun Bhutani, and Rohit Shahani were given salary increases of at least $25,000 per year for five years (bringing their then levels of compensation to $600,000, $500,000, and $550,000, respectively).

89.     The Director of Physician Recruitment, Alan Kram, reviewed the above salary increases and informed HQMP CCO Cindy Jacobs that the levels of compensation exceeded fair market rates and were not warranted by the surgeons' productivity levels (as measured by individual charges).  Jacobs responded that this was a "system initiative" and that HQMP had to pay the surgeons what they wanted.

90.     In fact, HQMP did this to keep the surgeons at HQSI hospitals because they also brought in substantial other revenue by referring patients to other HQSI- and HQMP-affiliated providers (e.g. other surgeons, primary care physicians, ob-gyn physicians, etc.) and by generating revenue through performing surgeries at HQSI hospitals, ancillary testing and hospital admissions.

24

**H.      Wrongful Retention of Improperly Received Payments**

91.     Defendants conducted a number of internal billing compliance audits during 2012 which revealed some or all of the above-described false and fraudulent billing practices. These include, but are not limited to, an April 2012 audit of AWV billing by HQSI Manager of Coding and Revenue Cycle Operations, Patricia Hubbard, whom Relator supervised, and a May 30, 2012 report of upcoding and improper signing of provider notes by HQSI Revenue Integrity Officer, Lance Smith.

92.     On several occasions during his employment, Relator spoke to or emailed Defendants senior management about internal audit findings of improper billing practices, as well as his own observations of such activities.

93.     During Relator's tenure, Defendants' senior management did not take any meaningful steps to remedy the false or fraudulent practices of which they had become aware through internal audits, Relator's communications or other sources of information.

94.     Upon information and belief, since becoming aware of the unlawful practices alleged in this complaint, Defendants have not refunded any monies to Medicare or Medicaid that they received through them. Relator's belief is based on, among other things, the following statement made to him by his supervisor, HQMP Chief Operating Officer ("COO"), Cindy Jacobs, after Relator had suggested to her that Defendants needed to refund Medicare payments for the improperly billed AWVs that had been uncovered by Hubbard's internal audit: "We do not go back and correct all variances shown by our audits."

## FACTUAL ALLEGATIONS CONCERNING
## DEFENDANTS' RETALIATION AGAINST RELATOR

95.     Defendants hired Relator as Director of Operations of HQSI on or about March 2,

2012. He reported to HQMP COO Cindy Jacobs, who in turn reported to HQMP President and

CEO Dr. Arun Agarwal.

96.     Shortly after he began working for Defendants, Relator learned from reviewing

internal audits and reports prepared by other employees, including, but not limited to, HQSI

Manager of Coding and Revenue Cycle Operations, Patricia Hubbard, whom Relator supervised,

and HQSI Revenue Integrity Officer, Lance Smith, as well as Relator's own investigations, that

Defendants were engaged in some or all of the false and fraudulent billing activities alleged in this

complaint.

97.     Relator repeatedly reported his findings of, and voiced objections to, Defendants'

improper billing practices to senior management in meetings, telephone conversations and emails.

These include, but are not limited to: (a) in ad hoc meetings and conversations with HQMP COO

Jacobs beginning in or about April 2012; (b) at a meeting with HQMP COO Jacobs and VP of

Compliance, Tim Cleary, on or about May 30, 2012; (c) at a meeting with HQMP COO Jacobs

and HQSI credentialing manager, Ally Nodal-Vataj, on or about June 18, 2012; (d) at a meeting

with HQMP COO Jacobs and HQSI Manager of Coding and Revenue Cycle Operations, Patricia

Hubbard on or about August 23, 2012; (e) and at an HQMP monthly finance meeting on or about

September 24, 2012, which meeting was attended by, among others, HQMP President and CEO

Dr. Arun Agarwal; HQMP COO Cindy Jacobs; HQMP CFO Alan Mosoff; HQSI CFO, Maryanne

Kepple; HQSI Director of Billing, Christina Pena; and HQSI credentialing manager, Ally Nodal-

Vataj.

26

98.     Defendants' senior management refused to further investigate or remedy the improper practices Relator highlighted in his alerts to them.  Instead, Defendants responded to Relator's fraud alerts initially by putting him off (for example, by telling him, "Don't worry about it." or saying that someone else would address the issue) and then ultimately by terminating his employment, without warning or notice, on or about October 4, 2012.

99.     At the time of his termination, HQMP COO Cindy Jacobs told Relator he was being fired because he was not a good "team builder."

100.    Jacobs stated reason for Relator's termination was a pretext.  In fact, Relator was fired because he attempted to uncover, report, remedy and prevent one or more of the false and fraudulent healthcare billing practices described in this complaint.

101.    Additionally, Relator's contract of employment obligated Defendants to compensate Relator for 40 "Paid Time Off" days per year, accrued on a biweekly basis with unlimited accumulation, commencing on Relator's first day of employment.

102.    After he was fired, Relator tried repeatedly to receive compensation for his promised Paid Time Off days from Defendants.

103.    By letter dated April 8, 2013, Defendants refused to pay Relator for his accrued Paid Time Off, in contravention of Relator's employment contract, as well as Defendants' employment policies.  This was part of a continuing course of retaliatory conduct directed at Relator.

## COUNT I
### Federal False Claims Act Violations
### 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G) [amended May 20, 2009]

104.    Relator realleges the above allegations as if set forth fully here.

105.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32.

106.    Through the acts described above and otherwise, the Defendants, by and through their agents and employees: (i) knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval; (ii) knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; and (iii) knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, all in violation of 31 U.S.C. §§ 3729(a)(1)(A), (B) and (G) [amended May 20, 2009].

107.    On information and belief, the United States was unaware of the falsity of the records, statements, and claims made or submitted by Defendants.

108.    On information and belief, the false and fraudulent representations and claims made to the United States by Defendants were material to the Government's decisions to make Medicare and Medicaid payments to Defendants.

109.    On information and belief, if the United States had known of the false or fraudulent nature of Defendants' representations and claims, it would not have made the Medicare and Medicaid payments to Defendants.

110.     By reason of Defendants' violations of the False Claims Act, the United States has suffered economic loss.

## COUNT II
### New York False Claims Act Violations
### N.Y. Fin. Law §§ 189(1)(a), (b), (g) and (h) [effective August 26, 2010]

111.     Relator realleges the above allegations as if set forth fully here.

112.     In connection with claims submitted to the New York Medicaid Program and the United States, Defendants: (i) knowingly presented, or caused to be presented a false or fraudulent claim for payment or approval; (ii) knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim; (iii) knowingly made, used or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government; and (iv) knowingly concealed or knowingly and improperly avoided or decreased  an obligation to pay or transmit money or property to the state or a local government, or conspired to do the same, all in violation of  N.Y. State Fin. Law §§189(1)(a), (b), (g) and (h).

113.     On information and belief, the State of New York has paid money to the defendants upon the false, fictitious, or fraudulent claims described in this complaint and has thereby suffered damages.

114.     On information and belief, if the State of New York had known of the falsity of the Defendants' claims, it would not have made the Medicaid payments to Defendants.

115.     By reason of Defendants' violations of the New York False Claims Act, the State of New York has suffered economic loss.

## COUNT III
### Retaliation in violation of 31 U.S.C. § 3730(h)

116.   Relator realleges the above allegations as if set forth fully here.

117.   By their conduct described above, Defendants violated the whistleblower protection provisions of the FCA, 31 U.S.C. § 3730(h) (as amended May 20, 2009) by wrongfully retaliating against Relator, including, by terminating Relator's employment and refusing to pay him all compensation due and owing, because of lawful acts done by Relator in furtherance of an action under the FCA and other efforts to stop one or more violations of the Act, including, by internally investigating and reporting possible FCA violations. Relator has been damaged by Defendants' wrongful conduct.

## COUNT IV
### Retaliation in violation of N.Y. State Fin. Law § 191(1)

118.   Relator realleges the above allegations as if set forth fully here.

119.   By their conduct described above, Defendants violated the whistleblower protection provisions of the NYSFCA, N.Y. State Fin. Law § 191(1)(a), by wrongfully retaliating against Relator against Relator, including, by terminating Relator's employment and refusing to pay him all compensation due and owing, because of lawful acts done by Relator in furtherance of an action under the NYSFCA and other efforts to stop one or more violations of the Act, including, by internally investigating and reporting possible FCA violations.

120.   Relator has been damaged by Defendants' wrongful conduct.

30

## DEMAND FOR RELIEF

WHEREFOR, Relator, on behalf of himself individually, and acting on behalf and in the name of the United States and the State of New York, demand judgment against the defendants as follows:

A.    On Count I,

(i)    Directing that Defendants cease and desist from violating the FCA;

(ii)   In the amount of three times the amount of damages the United States has sustained because of defendants' actions, plus a civil penalty of $11,000 for each act in violation of the FCA, as provided by 31 U.S.C. § 3729(a), with interest;

(iii)  Directing that Relator be awarded the maximum amount available under 31 U.S.C. § 3730(d) for bringing this action, namely, twenty-five percent of the proceeds of the action or settlement of the claim if the United States intervenes in the matter (or pursues its claim through any alternate remedy available to the United States, 31 U.S.C. § 3730(c)(5)), or, alternatively, thirty percent of the proceeds of the action or settlement of the claim, if the United States declines to intervene;

(iv)   Awarding Relator all reasonable expenses necessarily incurred in prosecution this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(d);

B.    On count II,

(i)    Directing that Defendants cease and desist from violating the NYSFCA;

(ii)   In the amount of three times the amount of damages which the State of New York has sustained because of Defendants' actions for each act of Defendants in violation

of the NYSFCA, plus a civil penalty of $12,000 for each violation, as provided by N.Y. Fin. Law§189(1)(g)(ii);

(iii) Directing that Relator be awarded the maximum amount available under N.Y. Fin. Law § 190(6), awarding Relator the maximum amount available under the NYSFCA for bringing this action, namely, twenty-five percent of the proceeds recovered in the action or in settlement of the action if the New York attorney general elects to convert the qui tam civil action into an attorney general enforcement action, or, if the New York attorney general does not elect to intervene or convert the action, thirty percent of the proceeds recovered in the action or settlement of the action;

(iv) Awarding Relator all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by N.Y. Fin. Law § 190(6);

C. On Count III, reinstatement, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, and all other relief necessary to make Relator whole;

D. On Count IV, an injunction to restrain continued discrimination; hiring, contracting or reinstatement to the position such person would have had but for the discrimination or to an equivalent position; reinstatement of full fringe benefits and seniority rights; payment of two times back pay, plus interest; and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees; and

E.     All other appropriate relief for the United States, the State of New York, and

Relator.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Relator hereby demands that this case be

tried before a jury.

Dated: April 2, 2015
New York, NY

/s/ Timothy J. McInnis
Timothy J. McInnis, Esq. [TM-7151]
McInnis Law
521 5th Avenue, 17th Floor
New York, NY 10175-0038
Tel. (212) 292-4573
Fax (212) 292-4574
tmcinnis@mcinnis-law.com

Thomas R. Fallati, Esq.
Tabner Ryan and Keniry LLP
18 Corporate Woods Boulevard,
Albany, NY 12211
Tel. (518) 512-5307
Fax (518) 465-5112
trf@trklaw.com

*Attorneys for Relator*

33